ROSEANNA MERRILL, appellant,

*v.*

WILLIAM J. RUSH, executor, respondent.

The testamentary capacity of a testatrix eighty-three years of age when her will was executed, who mentioned twenty of her intended legatees to her scrivener, and noted the omission of one of them when he read the will over to her, supported by the testimony of the surviving attesting witness and scrivener of her will, and by her physician and other witnesses, established, although her

forgetfulness in regard to some minor matters was shown, and it appeared that she had made an unjust and unfounded accusation against a person who, however, had no natural claims upon her bounty.

Appeal from the decree of the orphans court of Warren county, admitting to probate the will of Rachel Rush, deceased.

*Mr. Henry S. Harris,* for appellant.

*Mr. L. De Witt Taylor,* for respondent.

THE ORDINARY.

The appeal brings up for consideration the question whether a paper purporting to be the last will of Rachel Rush, deceased, late of the county of Warren, and executed by her as such, shall be admitted to probate. The testatrix, at the time of her death, October 8th, 1878, was of very advanced age, being a little over ninety. When the will was made she was over eighty-three years of age. It was made, then, about seven years before she died. By it, after ordering the payment of all her just debts and funeral expenses, she gave to certain of her grandchildren, by name, $50 each; to Rachel Rush, daughter of her son, Peter J. Rush, her feather bed and bedding and $50; to the daughters of her deceased daughter Margaret, $50, to be divided among them equally; to the Baptist church of Montana, Warren county, $50; to her six daughters-in-law, $100 each, and to her two daughters and six sons the residue of her property; and she appointed her son, William J. Rush, executor. Of the testamentary witnesses, only one, James Vliet, is living. He drew the will. It is dated January 11th, 1871, and was executed on the day, or the day after, it bears date; probably the former.

Mr. Vliet had drawn two wills previously to this for her, and he drew this at her request. She appears to have sent for him to get him to draw it, and he went to her place of residence at the house of her son, Peter J. Rush, where she had lived for many years. She told him that she wanted to make some alter-

Merrill *v.* Rush.

ations in her will, and he made a note, at the time of the altera-
tions, which she wished to make.  He drew the will accordingly,
and returned with the paper to the same house the next day.
When he arrived there he and she retired to a separate room, and
he then read the will to her.  As he read it she perceived that
he had omitted one of the persons to whom she desired to make
a bequest—Mary M. Beers, daughter of her daughter Maria—
and remarked that he had left her out.  He thereupon made the
correction, by interlineation, and finished reading the will to her,
and she pronounced it to be right.  At his first call upon her,
she spoke to him about procuring a witness, and it was under-
stood between them that he would see Martin H. Tinsman, and
bring him with him to witness the execution of the will with
him.  He brought Tinsman accordingly, and the latter, with Mr.
Vliet, witnessed the execution of the will by her.  As before
stated, Tinsman is dead.  The will was executed with all due
legal formalities.  The attestation clause is as follows :

" Signed, sealed, published and declared by the above-named Rachel Rush,
to be her last will and testament, in the presence of us, who were present at
the same time, and subscribed our names as witnesses in the  presence of the
testator and each other."

The attestation clause is perfect, and it may be added that the
proof *aliunde* establishes all the requisites of the statute.  After
the will was executed, Mr. Vliet inquired of the testatrix what
directions she would give as to the custody of the paper.  She
said she desired him to retain it, and he did so, from that time
up to a few days after her death.  He was well acquainted
with her.  As before stated, he had drawn two previous wills
for her.  One was executed in March and the other in June,
1868, and he had had the custody of them.  They remained in
his custody after cancellation, and appear to be there still.  He
testifies that the will was drawn in conformity to her directions,
and that at the time of the execution of the paper she was of
sound and disposing mind, memory and understanding.  There
is no proof whatever of the exercise of undue influence over her
in the making of the will.  Its admission to probate is resisted,

on the ground that when it was made she had not testamentary capacity. In the will she makes bequests to more than twenty of her grandchildren, making mention of them by name in every instance but one (the daughter of her daughter Margaret), with correct reference to their parentage. She mentions each of her daughters-in-law, and makes a bequest to each, and then gives to her daughters and sons the entire residue of her property. She gave to Mr. Vliet the instructions for that will, as before stated, and he testifies that no one except him and her was present at the time. It is urged, on behalf of the caveatrix, that the testatrix was under delusions in regard to an injury done to a horse belonging to her, from which it died, and also as to certain small articles of household furniture of little value, which she alleged had been stolen from her. The injury referred to she imputed to Charles B. Rush, and the theft to his wife. She lived with them from the death of her husband, which occurred in the fall of 1867, until the spring of 1868. The horse was with her there. She appears to have been very much attached to it. While she was there she charged Rush with having unduly worked it, and there were unpleasant, not to say unfriendly, words between them on the subject. The horse was not injured, and did not die at his place, but at her son's, where she lived at the time. Her suspicion or belief that Rush had maliciously done the injury which resulted in the death of the horse was unjust to him, but it evidently arose from her state of feeling towards him in connection with the difficulty before referred to, which had occurred between them in respect to the horse. As to the household articles which she charged his wife with having stolen, the latter testifies that some of them were given to her by the testatrix, and it appears that as to the others, certain dishes, the testatrix had given them to her daughters, and had probably forgotten the fact. The hallucinations, if such they may be called, had no reference, however, to any person who had reason to expect to be a recipient of her bounty, or who had any claims by nature upon her in her distribution of her estate. There is no evidence that they in anywise affected her testamentary disposition of her property, and if there were evidence that it had

done so, probate of the will would not be denied on that account where the denial would not avail those who, but for the delusion, would have been recipients of the testator's bounty. *Stackhouse* v. *Horton, 2 McCart. 202.* Her conviction as to the cause of the death of the horse was the offspring of the ill opinion which she had of Charles B. Rush. In the charge made against his wife in respect to the dishes, there is evidence of failing memory.

It appears, however, affirmatively, in respect to both these charges, that she readily yielded to the considerations which would convince a sane mind. Asa Kinney, a witness sworn on behalf of the caveatrix, says that after he told her she could not punish Rush for the injury to the horse, because she could not prove that he was on the ground when the injury was done, she gave the matter up. She seems, also, to have accepted the statement of her daughter that the dishes had been given by her to her daughters. It is charged, also, that the condition of her mental and bodily health was such, while she was living with Charles B. Rush, from the fall of 1867 to the spring of 1868, as to indicate testamentary incapacity, but the circumstances adduced are evidence only of the failure of memory in reference to recent matters, incident to old age, and a disregard of the proprieties of life with respect to cleanliness. As to this latter circumstance, the proof depends wholly on the testimony of Rush and his wife. She lived with them, as before stated, from the fall of 1867 to the spring of 1868. She lived nearly ten years after she left their house. She lived at three different places afterwards. If her mind was so far gone when she lived at Charles B. Rush's as that she had, by reason of want of mental capacity, no regard for the decencies of life (for what is charged upon her is said not to have been done through or when she was in a state of illness), it is remarkable that the like evidence of insanity was not found in her conduct afterwards. It is reasonable to suppose that Dr. Hulshizer and Mrs. Fangboner, of whom more particular mention will be made hereafter, should not have known of any such evidence of incompetency. The opinions of witnesses other than the testamentary witnesses or experts, are not competent on the subject of capacity. The testimony of Mr. Vliet has already

been adverted to.  Dr. Hulshizer speaks of the testatrix, during the last few years of her life, from a period prior to the year 1872.  As before stated, the will was made in January, 1871. He testifies that he attended her at different times from a period probably shortly before 1872 to her death, but that she did not require any particular attention from a physician; that the condition of her health during the time that he knew her was good; that he talked to her several times, and took pleasure in talking to her, on account of her age.  He says that he never saw anything that would lead him to question her competency; that in the conversations that he had with her, she would be very explicit in recounting to him the occurrences of her past life; that from what she would tell him on those occasions, he thought her mind was remarkable; that she always recognized him, and that prior to the last two or three years of her life, he never saw anything that led him to believe that she was not of sound mind.  Mrs. Fangbouer, who knew the testatrix from May, 1869, up to the time of her death, and was intimately acquainted with her—sometimes, as she says, seeing her every month, and in 1874, being at the house where the testatrix lived, from April to October, all the time, and prior to that time, as she testifies, having seen the testatrix every month—had frequent opportunities of observing her mental condition, and appears from her intelligence to have been able properly to estimate the qualities of the testatrix's mind.  She testifies that she frequently conversed with the testatrix, when she was there at the house, and while she lived there, as above mentioned, she conversed with her every day.  She speaks of the qualities of her mind, and says she observed nothing to lead her to conclude that the testatrix had become irrational, but the contrary.  Other witnesses give testimony to the same effect.

It is alleged, on the part of the caveatrix, that the testatrix did not know what property she had, and this is urged as strong evidence of want of capacity.  The allegation is that she supposed her property amounted only to $900, whereas, in fact, she had $5,000, and the interest of $10,000 for her life.  It is very probable that, in speaking on the subject, she spoke of her annual income, which

Merrill v. Rush.

was about $900, as her property.  But it is quite evident from her will that she knew that she had much more than $900, for she gives nearly $3,000, in small legacies, to her grandchildren and daughters-in-law, and then gives the residue of her estate—presumably, under the circumstances, the greater part to her eight children.  Moreover, she knew who had charge of her property, and if she was, indeed, ignorant of so important a fact as the amount of her property, Mr. Vliet, who knew all about it, could not have failed to discover it.  The will is not only a natural one, but it evinces great care on the part of the testatrix for those who had a right to her estate or to remembrance in her will.  As before stated, she mentions a score of her grandchildren, and did not forget the family of the caveatrix (who is a granddaughter), for she gave a legacy to her sister.  On a consideration of all the evidence, it seems to me quite clear that the testatrix, at the time of making the will in question, was possessed of testamentary capacity, and that it is her true last will and testament.

The decree of the orphans. court will be affirmed, with costs of appeal to be paid by the appellant.